[No. 3168.  Decided March 22, 1899.]

JOHN SERVICE et ux., *Respondents*, v. THE DEMING INVESTMENT COMPANY, *Appellant*.

PRINCIPAL AND AGENT—AUTHORITY TO SELL LAND—AGENCY—EVIDENCE
—PAROL.

Although the authority of an agent may be merely an oral authorization to find a purchaser for certain land, yet his written contract for its sale is binding on his principal, when the principal subsequently ratifies the same by agreeing to the terms of sale and accepting earnest money paid thereon.

In the examination of a witness, it is not error for the court to permit him to state his conclusion or opinion as to the relationship of principal and agent between defendant and another, without disclosing facts which would constitute agency, as the grounds upon which the conclusion of the witness is based may be probed on cross-examination.

Parol testimony as to the contents of a written instrument is admissible, upon proof of loss of the original, and that it could not be found after diligent and careful search.

In an action for damages for failure to convey land, to which the defence is raised that the contract of purchase was made with an unauthorized agent of defendant, an unexecuted contract transmitted in a letter by defendant to the alleged agent, conforming to the terms of the contract as made by him, is admissible in evidence as a fact tending to show the alleged agent's authority and ratification by the defendant.

Appeal from Superior Court, Spokane County—HON. LEANDER H. PRATHER, Judge. Affirmed.

*Danson & Huneke*, for appellant.

*W. H. Ludden* (*James Z. Moore,* of counsel), for respondents.

The opinion of the court was delivered by

GORDON, C. J.—Plaintiffs, John and Mary J. Service, are husband and wife. They sued to recover damages for the breach of a contract whereby the defendant agreed to sell a certain farm to them. From a judgment in their favor, the defendant has appealed.

The appellant is a corporation of the state of Kansas, and for a number of years past has been doing business in this state, with a local office at Colfax, Washington. Its principal business in this state is loaning money, and incidentally thereto manages and disposes of real estate for its eastern clients. Among other properties which it was so managing was the farm in question, located in Whitman county, in this state. In its answer it alleges that it had full right and authority to enter into a contract of sale of the land for the owner. The farm is located near the village of Fairfield, and for a period of seven or eight years prior to the making of the alleged contract one Bradshaw, residing at Fairfield, had been engaged in making loans for the defendant, and in a few instances had procured purchasers for defendant's lands. The contract upon which the plaintiff relies was made with Bradshaw. Upon the part of the appellant it is admitted that Bradshaw was authorized to find a purchaser for the farm at $2,400. The evidence shows that on the 2d of September, 1897, the plaintiff John Service entered into negotiations with Bradshaw for the purchase of the farm. The purchase price agreed upon was $2,400. By the terms of the agreement plaintiffs were to make a cash payment of $500. The balance was to be in annual payments, secured by mortgage, and plaintiffs were to be let into immediate possession. Before executing any memorandum, Bradshaw and plain·

tiff John Service went to the telephone office in Fairfield, and Bradshaw talked over the telephone with the general manager of the appellant at Colfax. In this conversation Bradshaw stated:

"I told him that I had an offer for the Hardman farm; stated the terms of $500 cash, $200 the first of January, 1898, and the balance in five years. I think I did not state the amounts, but that it would be divided up satisfactorily to the purchaser so that he could make the payments at ten per cent. interest; and Mr. Waskey (the manager) asked if I had anything paid down. I told him I had not, and he said, 'Better have a hundred dollars forfeit money.' Mr. Service was standing in the office booth, or whatever you might call it, at the time, and I simply told him that they required him to pay a hundred dollars forfeit money. He said he did not have it then, but could get it. And then I did not see Mr. Service any more until the next day. He told me to come down the next morning and he would have the hundred dollars.

"Q. Did Mr. Waskey say anything to you during that conversation about the terms of the sale; whether they were satisfactory to him or otherwise?

"A. He approved of the sale. In what words I can't say."

Following this conversation over the telephone, Bradshaw immediately wrote Mr. Waskey, informing him in detail of the terms of the proposed sale; and on the following day, viz., September 3d, received in due course of mail the following letter, which was received in evidence at the trial:

"Colfax, Washington, Sept. 3rd, 1897.

"I. W. Bradshaw, Esq., Fairfield, Washington: Dear Sir—We are just this noon in receipt of your letter of the 2nd inst. regarding the sale of the Hardman farm. The proposition of terms will be satisfactory to us.

"We note that Mr. Service wants possession at once, or as soon as the lease is out. We also note your postscript asking what arrangements had been made about the break-

ing done last spring—that one of the boys had broken out fifteen acres.

"In reply will say that our lease expires on November 1st, and, under its terms, we are to have possession of the property, if the crop is removed, on thirty days' notice, and therefore we herewith enclose you a notice to serve on the Bleisners and Shultz. This lease does not make any reference or conditions for the breaking of the land that you mention. We are not aware that any new land had been broken out. Was this new land in crop this year? Therefore, under the terms of the lease, we can give Mr. Service possession inside of thirty days. In fact we see no objection to him going on and plowing the land now, as we have a right to enter upon the premises that are not in crop, although the parties may keep possession of the buildings for the next thirty days after the notice is given. Wish you would kindly see the lessees in this case with reference to this 15 acres of breaking, and see what they have to say about it.

"We also understand there were 5 acres additional of wheat that was not cut and threshed at the time the other was cut and threshed. What about this? When are they going to cut and thresh this, and when will our share be delivered? What has been done with reference to the sacks? We want to get this sack matter closed up and paid for as soon as possible, and would like to have the tenants do something toward settling up their misunderstanding or difficulty with the warehouseman when they got the sacks.

"We will immediately make up contracts and forward for execution. The forfeit money deposit should be remitted to us. Yours truly,

"THE DEMING INVESTMENT Co.

"Enclosure: We enclose 3 notices, one for each party and one for you to certify to us."

On the same day Bradshaw received from the plaintiffs $100 in part payment and entered into a memorandum, which was signed by himself as agent of defendant company, and also by each of the plaintiffs, the substance of which was an acknowledgment of the receipt of $100 as

earnest money, and reciting that plaintiffs were to pay the further sum of $400 on the 8th of September and the balance in five annual payments, according to the conditions of a contract to be furnished by the defendant, and describing the land, and also containing the recital that it was made "subject to the approval of the Deming Investment Company." This memorandum was retained by Bradshaw and could not be produced upon the trial, diligent search having failed to disclose its whereabouts. However, on the 8th day of September, the plaintiffs were able and willing and offered to pay the further sum of $400 as agreed upon, but the formal contract and notes for the deferred payments not having been received by Bradshaw from Mr. Waskey, at Bradshaw's suggestion plaintiffs retained the money. On September 18th, a form of co·i tract was transmitted by Waskey to Bradshaw for execution, but it was not executed, because the notes and mortgage did not accompany it, and this occasioned further delay. On September 22d, Waskey transmitted to Bradshaw the following letter:

Sept. 22nd, 1897.

"I. W. Bradshaw, Esq., Fairfield, Washington: Dear Sir—Regarding the matter of closing the contracts of sale and signing notes on the Hardman place, please let it rest for a day or two and will send up the notes. We are rushed to death with some other matters and have just received a letter from our home office, and it may be necessary to make a small change or two in the contract. Will write you fully, as we are in a hurry to catch the mail. Yours truly,

"THE DEMING INVESTMENT CO."

After the matter had rested in that condition for some little time, the plaintiffs were notified that the land had been sold to another purchaser, for the eastern owner, and that it would be impossible for the defendant "to go ahead and complete the contract with Service." Thereupon plaintiffs began suit.

The main contention at the trial and in this court was and is that Bradshaw was without authority from the defendant to enter into any written contract for the sale, and, "while it has full power and authority to sell the land in question, that it had simply orally authorized Bradshaw to find a purchaser," and that it had never authorized him to enter into any agreement in writing for the sale of the land. After an examination of the entire evidence, in connection with the pleadings and admissions of the parties, we think that the verdict has sufficient legal and competent evidence in its support.   Conceding that the original authorization of Bradshaw by the defendant did not extend beyond the right to find a purchaser for the farm at the price of $2,400, it is undisputed that he did find the plaintiffs, who agreed and stood ready to fulfill their agreement to purchase at that price; that thereupon the defendant was notified of the fact that a purchaser had been found, informed who the purchasers were, and that the sum of one hundred dollars was paid by the purchasers under the express direction from the general manager of the defendant to Bradshaw to receive it.   Not only that, but he was directed to remit it, which was done.   Authority to execute the memorandum was, we think, fully conferred, if not in express words, certainly by the conduct of the defendant itself acting through its general manager; and his action was, we think, fully ratified, as appears from the subsequent letters and correspondence between the manager and Bradshaw. The price was agreed upon, the terms upon which it was to be paid were agreed upon, money was paid in pursuance of the agreement, and the party was let into possession. These are the elements and only essentials of a valid agreement to sell and convey.   It is conceded that the defendant had full authority to make the sale, and that at a subsequent period the authority was revoked by the owner in

no wise affects the case.  Under the pleadings, that ques-
tion cannot and does not arise.

There are a number of assignments made in the brief
predicated upon rulings made in the course of the trial.
The first goes to the question which the court permitted
plaintiff John Service to answer, relating to Bradshaw's
authority.  The specific question objected to was as follows:

"Now, Mr. Service, my question is, otherwise than what
was stated to you by Mr. Bradshaw, do you know whom he
represented there?"

The objection raised is that the question calls for a con-
clusion of law.  The second objection relates also to the
examination of the witness upon the same subject.  Plain-
tiff having stated that Bradshaw represented "The Dem-
ing Investment Company," counsel urges that it was mani-
festly improper, because calling for a conclusion of law and
as not disclosing the facts which in law would constitute an
agency.  But these questions were, we think, not improper.
Opportunity was afforded counsel to cross-examine as to
the grounds upon which the conclusion or opinion of the
witness was based.  Such is the object and purpose of a
cross-examination.  If it was error at all, it certainly would
not be reversible error, because in the examination of wit-
nesses great latitude is permissible in the discretion of the
trial court.  Nor did the court err in permitting the wit-
ness Bradshaw to testify as to the contents of the written
memorandum.  It was sufficiently shown that the memo-
randum itself had become lost and could not be found, al-
though diligent and careful search had been made in an
effort to find it.  Nor was it error to permit the unexecuted
contract which was contained in the letter from Waskey to
Bradshaw, of date September 18th, to be introduced.  It
had some bearing upon the question of the extent of Brad-
shaw's authority and whether his acts were ratified, and
the court properly limited the consideration to be given it
in submitting it to the jury.

Without extending this opinion to an unreasonable length by specifically noticing each objection or assignment relating to the trial of the cause, we deem it sufficient to say that each error assigned has been carefully examined, and we think that the rulings upon the evidence and the instructions of the court were in accord with the law. As stated at the outset, the case, so far as the merits are concerned, turns upon the question of Bradshaw's authority, and the evidence satisfies us that the verdict was right. It follows that the judgment should be, and it is, affirmed.

REAVIS, ANDERS, DUNBAR and FULLERTON, JJ., concur.