ALDRICH, Senior Circuit Judge,
dissenting.
The facts in this case are so unlikely to occur again that there is perhaps no point in my registering a dissent, but because I believe the court has seriously disregarded the Massachusetts brokerage eases, and has at the least suggested that if the broker’s principal' has to sue in order to obtain payment, the broker cannot recover, I feel I should do so. With respect, I believe that the alternative routes the court follows and the still different approach of the courts below each reflect upon the weakness of the others. Plaintiff did what he promised to do, obtain a customer, simpliciter; the customer received title and possession, and paid for it, though after an admittedly expensive lawsuit, but plaintiff broker has received no commission, either on the original, inadequate payment, the ultimate gross payment, or even the net, after-lawsuit, payment. Yet he was in no way responsible for the misconduct of his principal’s officers necessitating suit.
To look at the facts apart from the various legal analyses offered, plaintiff was employed by D.C. Sullivan Company (hereinafter the company) to produce a customer, plaintiff to take no part in the negotiations, but to be paid “a broker’s commission of five percent of whatever consideration you ... receive or will receive in the event that a deal is consummated with my customer Consolidated Service Corp. [the parent of Watts Detective Agency, Inc.]” This is a recognized form of brokerage agreement. See, e.g., Julius Tofias & Co. v. John B. Stetson Co., 19 Mass.App. 392, 474 N.E.2d 1162 (1985) (Dreben, J., collecting cases), where the court held that an agreement, “If any sale ... on ... introduction furnished by you,” does not require “efficient” or “predominating” cause. This being a Massachusetts diversity case, I note the identity of the court’s summation, that plaintiff was engaged “to introduce the owner to a prospective buyer and then to let the owner and the prospective buyer continue on by themselves to negotiate a ‘deal’ involving the transfer of the property and the price of the same” and the agreement in Holton v. Shepard, 291 Mass. 513, 197 N.E. 460 (1934), where a commission was to be paid “if he produced the purchaser to whom the defendant, acting in his own behalf should sell his business.”
After plaintiff produced Consolidated— Watts — Watts negotiated with one Otte, and another principal company officer. Watts, however, did not offer enough to pay off the company’s indebtedness to the IRS, which was showing an active interest in the sale because of the company’s apparent insolvency. As a result of a threatened levy by the IRS, a hasty transfer of assets was made to Watts, the consideration being Otte’s obtaining a job with Watts (bringing many seasoned guards and customers), plus the payment of $39,000 in back wages to the company’s employees. This transaction resulted in the company’s going out of business, leaving a number of unsatisfied creditors. Bankruptcy followed. The trustee, Robinson, sued Watts, alleging the conveyance to it was in fraud of creditors, viz., was “without fair consideration.”[1] He won, and this court affirmed a judgment of $750,000, plus interest. Robinson v. Watts Detective Agency, Inc., 685 F.2d 729 (1st Cir.1982), cert. denied, 459 U.S. 1105, 103 S.Ct. 728, 74 L.Ed.2d 953 (1983). *18 We noted that the statutory requisites for this recovery were present — that there was property, and that it had been transferred. The property was “the operating portion of the company’s business, i.e., its customer accounts, employees and goodwill,” (685 F.2d at 732), “precisely that for which [Watts] had been bargaining.” (Id. at 734). We further accepted that a “transfer was made by the ‘debtor.’ ... Of course, had these men been mere supervisory employees not empowered to act on behalf of the company, a different situation would have been presented.” (Id. at 733 n. 5). This judgment awarding the fair value of the property has been satisfied. Nonetheless my court allows plaintiff no commission on any monies received from his customer, not even on the original $39,000.
In the travel of this case various justifications for this have been offered. The bankruptcy court put it briefly. “Watts ... gained control of the Company’s accounts for no consideration going back to the Company.... The Court concludes that no ‘deal’ was consummated.” The district court said,
The money was not paid to D.C. Sullivan & Co., Inc.; it was paid to the former employees who joined the Watts Detective Agency, Inc. It was not money either paid or received because a “deal” was “consummated” between D.C. Sullivan & Co., Inc. and Goldman’s custom-er_ No such deal was ever consum- ' mated. The payment made for the benefit of the Watts Detective Agency, Inc. is clearly not the kind of “consideration” that was contemplated by the brokerage agreement.
These conclusions seem erroneous in every respect. It is not correct that payment to its employees was not payment to the company. Paying their back wages discharged what would have been priority claims against the estate. 11 U.S.C. § 104(a)(2) (superseded). The fact that this direct benefit to the estate may be thought to have pleased Watts, who had taken over some of the employees, is res inter alia. Watts owed them nothing. How was it not part of a deal arranged between plaintiff’s customer and the company?
By selecting three out of a dozen dictionary definitions of “deal,” from which it concludes that a “price” must be paid, (in other words, there would have been a “deal” if the transaction had closed for more money — see 685 F.2d, at 732, second column) the court says there was no deal here because there was “no present consideration to Watts, followed by a ten year lag before a jury finally set the value of the fraudulent diminution of assets, such amount being burdened by substantial obligations to litigation counsel.” (footnote omitted).
The first part of this quotation is a repetition of the error below. Four judges have now passed on this matter. Three have said “no consideration [went] back to the Company,” or “no present consideration to Watts.” The fourth, the district court, hedged by saying it was not “received because a ‘deal,’ was ‘consummated,’ ” which is whipping the devil around the stump if the test of a deal is whether there was a price paid.
I am at a loss to see how it can be said that no price was paid. The only flaw in the case is that too little was paid; a deficiency thereafter remedied.
The district court supported its conclusion by adopting “the trustee’s words, ‘Goldman brought a thief to the party and the thief was ordered to make restitution. And because the thief made restitution and put us back where we should have been before any sale, he [Goldman] wants a commission.’ ” While my court, presumably, recognizes the failure of this analogy, since thievery is a unilateral act transferring not even a defeasible title, it endorses the district court’s condemnation of our Robinson holding of a transfer, see, ante, as being a “traditional metaphor.” Having in mind that one of the statutory requirements is the actuality of a transfer, this seems too easy a killing.[2] It then recognizes a trans *19 fer, and with a passing reference to then 11 U.S.C. § 110(e)(2) says that the legislative theory is “cancellation,” inferentially adopting the district court’s “restitution and put us back where we should have been before any sale.” “Accordingly, undoing a wrongful transfer of property is the very antithesis of ‘consummating a deal.’ ”
With respect, the court is wrong both ways. Not only was there a real, not a metaphorical, transfer, but it was not undone. Had the trustee sought, and recovered, the property, it would have been undone, and the single Massachusetts case the court cites in its opinion would have been applicable. On a justifiably revoked transaction I would readily admit that no commission would be earned. McCarthy v. Reid, 237 Mass. 371, 129 N.E. 675 (1921). The trustee’s lawsuit, however, “cancelled” nothing but the limited consideration, recovering the fair one. The transfer to plaintiff’s customer was confirmed, not “put us back;” the estate had the cash, not the property. But, somehow, the original agreement, very literally covering “receive or will receive,” is out the window.
Seemingly, by its reference to ten years of expensive litigation, the court feels that plaintiff should suffer because of the malfeasance of his customer. While there appear to be very few eases, as a matter of general law the fact that a seller has to sue the purchaser does not deprive the seller’s procuring broker of his compensation. Rouda & Co. v. Springtime Co., 49 Ohio App.2d 49, 359 N.E.2d 450 (1975). See also Bechtel Properties, Inc. v. Blanken, 194 F.Supp. 638 (D.D.C.1961), aff'd, 299 F.2d 928, 929, cited with approval in Massengale v. Transitron Electric Corp., 385 F.2d 83, 87 (1st Cir.1967). The court refers to that part of the contract which provided that no commission would be earned if the property was sold to “someone else.” It was not. It was sold to Watts initially, although defeasibly vis-a-vis the seller’s creditors, and the condition was removed by plaintiff’s customer’s further payment. Seemingly, the lawsuit was the efficient or predominating cause?
Except to lament the lawsuit’s cost, the court suggests no answer to Julian Tofias & Co. v. John B. Stetson Co., ante, to the effect that an introduction brokerage agreement does not require predominating cause. True, the customer and the company officers misbehaved, but the inescapable fact is that plaintiff introduced a customer, the company transferred the property to it, and the company received its fair value from it. Although the court denies a “deal,” surely the parties did negotiate. The fact that they intended the price to be only $39,000, plus a job for Otte, and failed to realize, or closed their eyes to, the pertinent statutory requirement that the customer was obligated to pay the full value, does not mean that plaintiff was not responsible for its receipt. If one were to look with legal niceness, it could be said that the statute was a part of the deal. If one were to look more broadly, the statutory payment was a proximate consequence of it. Either way, plaintiff has been short changed. I dissent.[3]

. Former 11 U.S.C. § 107(d)(2)(a).

. The transfer was not any the less of a transfer because the statute provided it was "null and *19 void against the trustee.” As the Court has pointed out, this means void as against the trustee if he so elects, i.e., "voidable by the trustee.” Fischer v. Pauline Oil Co., 309 U.S. 294, 300-303, 60 S.Ct. 535, 538-539, 84 L.Ed. 764 (1940); City of New York v. Johnson, 137 F.2d 163, 165 (2d Cir.1943); see Geremia v. First National Bank of Boston, 653 F.2d 1, 7 (1st Cir.1981); 4 Collier on Bankruptcy ¶67.41[3] (14th Ed. 1978). The transaction is complete unless the trustee elects to undo it.

. I would add that a commission to plaintiff would not even be an unjust increment at the estate’s expense. If the trustee, instead of suing for the fair value, had sought and recovered the property back (assuming, for the sake of this argument, that were possible) he would then have to sell it and, presumably, pay a commission. Here he has sold it, and has paid no commission. The court is rightly offended by the misconduct of the principal parties, but rectifying that would not have saved a commission; nor was the misconduct chargeable to plaintiff. I do not suggest this solution, but why should not plaintiff be paid at least on the basis of the net receipts from his customer?